**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

05 1062

CAROL A. BLANCHARD,  EXECUTIVE DIRECTOR )
of the TEAMSTERS UNION 25 HEALTH SERVICES )
AND INSURANCE PLAN, )

MAGISTRATE JUDGE *Alexander*

     Plaintiff, )

v. )    **Civil Action No.**

HALL & COLE PRODUCE,  INC. and )
HOWARD B. HALL, III )

     Defendants. )

RECEIPT #_____
AMOUNT $.250
SUMMONS ISSUED (e)
LOCAL RULE 4.1
WAIVER FORM_____
MCF ISSUED_____
BY DPTY CLK._____
DATE 3/30/05

## COMPLAINT

### Introductory Statement

1.    This is an action brought on behalf of Teamsters Union 25 Health Services and Insurance

Plan (hereinafter, the "Plan") to enforce the terms of the Plan documents and compel the

Defendants, Hall & Cole Produce, Inc., and Howard B. Hall, III, to allow the Plan to

audit payroll records of Hall & Cole Produce, Inc., concerning contributions made to the

Plan.

### Jurisdiction and Venue

2.    The jurisdiction of this Court is founded upon Section 502(e)(1) of the Employee

Retirement Income Security Act of 1974 (hereinafter, "ERISA"), as amended, 29 U.S.C.

§1132(e)(1), which grants the district courts of the United States exclusive jurisdiction of

civil actions brought to enforce the terms of an employee benefit plan and/or the

provisions of ERISA

3.    Venue is appropriate in this Court under Section 502(e)(2) of ERISA, 29 U.S.C.

§1132(e)(2), which provides that an action may be brought in the district where the

relevant employee welfare benefit plan is administered. and pursuant to 28 U.S.C.

§1391(a), because Plaintiff's claims arose in this District.

### Parties

4.    Carol A. Blanchard (hereinafter, "Plaintiff") is the Executive Director of the Teamsters

Union 25 Health Services and Insurance Plan (hereinafter, "Plan"). She is a fiduciary of

the Plan within the meaning of ERISA Section 3(21), 29 U.S.C. §1002(21), and he is

authorized to bring this action on behalf of the Plan.

5.    The Plan is an "employee welfare benefit plan" within the meaning of ERISA Section

3(1), 29 U.S.C. §1002(1), and is a "multi-employer plan" within the meaning of Section

3(37)(A) of ERISA, 29 U.S.C. §1002(37)(A). The Plan is administered by Trustees in

accordance with LMRA Section 302(c)(5), 29 U.S.C. §186(c)(5), and exists for the

exclusive purpose of providing health, medical and related benefits to its participants and

beneficiaries. The Plan has its principal office and is administered from 16 Sever Street,

Charlestown, Massachusetts 02129.

6.    Defendant, Hall & Cole Produce, Inc. (hereinafter, "Hall & Cole Produce") is a

corporation with a usual place of business at 1 Heather Lane, Hingham, Massachusetts,

02150.

7.    Defendant, Howard B. Hall, III, (hereinafter, "Hall") is the principal officer of Hall &

Cole Produce, serving as President, Treasurer and Secretary, and has a usual business

place at 1 Heather Lane, Hingham, Massachusetts, 02150.

## Allegations of Facts

8.    Throughout all times relevant herein, Defendant, Hall & Cole Produce, Inc., has been

obligated to make contributions to the Plan in accordance with the terms of an Agreement

and Declaration of Trust executed between Defendant and the Plan, said contributions to

be made on behalf of each employee of the Defendant performing work within the scope

of and/or covered by one or more collective bargaining agreements executed by the

Defendant and Teamsters Local Union No. 25 (hereinafter, "Local 25"). A true copy of

the Agreement and Declaration of Trust is attached hereto as Exhibit 1.

9.    Pursuant to a collective bargaining agreement executed by Defendant and Local 25,

Defendant authorized the Plan Trustees to have an independent certified public

accountant audit Defendant's payroll and wage records to determine the accuracy of its

contributions to the Plan. A true copy of the collective bargaining agreement is attached

hereto as Exhibit 2.

10.    Hall & Cole Produce ceased operations on or about January 30, 2004.

11.    From  July 28, 2004 to the present, accountants retained by the Plan Trustees have

attempted to schedule an appointment with the Defendant for the purpose of examining

and auditing Defendant's payroll records from January 1, 2003 through January 30, 2004.

A true copy of the accountants' July 28, 2004 letter is attached hereto as Exhibit 3.

12.    From July 28, 2004 and continuing to the present, the Plan's accountants have been

denied access to Defendant's payroll records.

3

## COUNT I

### (Enforcement of the Plan's Terms)

13.    Plaintiff reavers every allegation contained in paragraphs 1 through 12 herein.

14.    Defendant, Hall & Cole Produce, Inc., has violated the terms of the Plan by failing to

furnish the accountants retained by the Plan with the information and documentation

referred to in paragraph 9.

15.    Plaintiff is entitled to enforcement of the Plan's terms pursuant to ERISA Section

502(a)(3), 29 U.S.C. §1132(a)(3).

## COUNT II

### (Breach of Contract)

16.    Plaintiff reavers every allegation contained in paragraphs 1 through 15 herein.

17.    Defendant Hall & Cole Produce, Inc.,  has breached its contractual obligations to furnish

the information and documentation referred to in paragraph 9.

18.    Plaintiff is entitled to enforcement of those contractual obligations.


**WHEREFORE**, the Plaintiff prays the Court to grant her the following:

(a)    A judgment in favor of Carol A. Blanchard, as Executive Director of the
Teamsters Union 25 Health Services and Insurance Plan, and against Hall & Cole
Produce, Inc.;

(b)    An order obligating Defendant Hall & Cole Produce Inc., to furnish the
accountants retained by the Plan with the information and documentation referred
to in paragraph 9;

(c)    Attorneys' fees and costs; and

(d)    Any such other relief as the Court finds appropriate.

For the Plaintiff,
**CAROL BLANCHARD, EXECUTIVE DIRECTOR of the TEAMSTERS UNION 25 HEALTH SERVICES AND INSURANCE PLAN**
By his attorneys,

_____
Matthew E. Dwyer
B.B.O. # 139840
Kathleen A. Pennini
B.B.O. # 654573
Dwyer, Duddy & Facklam, P.C.
One Center Plaza; Suite 360
Boston, MA  02108-1804
(617) 723-9777

Date:   March __ , 2005
f:\l25hsip\hall&coleproduce\pldg\complaint.doc:blg

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)   Carol A. Blanchard, Executive Director of the Teamsters
Union Health Service and Insurance Plan v. Hall & Cole Produce, Inc. and Howard B. Hall, III

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| [ ] | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
| [✓] | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
| [ ] | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| [ ] | IV. | 220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| [ ] | V. | 150, 152, 153. |

*Also complete AO 120 or AO 121 for patent, trademark or copyright cases

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]   NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]   NO [✓]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]   NO [✓]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]   NO [ ]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [✓]   NO [ ]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [✓]   Central Division [ ]   Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]   NO [✓]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   Matthew E. Dwyer

ADDRESS   Dwyer, Duddy and Facklam, P.C., One Center Plaza, Suite 360, Boston, MA 02108

TELEPHONE NO.   (617) 723-9777

(CategoryForm.wpd - 2/15/05)

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Carol A. Blanchard, Executive Director of the Teamsters Union 25 Health Services and Insurance Plan | Hall & Cole Produce, Inc., and Howard B. Hall, III |

| **(b)** County of Residence of First Listed Plaintiff  Suffolk | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Matthew E. Dwyer; Kathleen A. Pennini, Dwyer, Duddy and Facklam, P.C., One Center Plaza, Suite 360, Boston, MA 02108 (617) 723-9777 | |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question (U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. 1132

Brief description of cause:
Defendant has failed to allow the Plaintiff to audit its payroll records as required by the terms of the Plan

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:　☐ Yes　☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #　　　　AMOUNT　　　　APPLYING IFP　　　　JUDGE　　　　MAG. JUDGE

# Teamsters Union 25
# Health Services & Insurance Plan



## *AGREEMENT AND DECLARATION*
## *OF TRUST*

**As Revised**
**July 25, 1975**

# *AGREEMENT AND DECLARATION OF TRUST*

This Agreement and Declaration of Trust originally made the twelfth day of April, 1954 by and between the five Employer Trustees, signatories thereto and the five Union Trustees, signatories thereto hereinafter collectively called the "Trustees"; the Employers Group of Motor Freight Carriers, Inc., hereinafter referred to as the "Association"; and Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25, hereinafter referred to as the "Union"; and the several Employers who are, and the several Employers who shall join and become parties to this Agreement and Declaration of Trust as hereinafter provided.

## WITNESSETH

WHEREAS, an Agreement dated April 12, 1953 had been entered into between the Association and the Union which Agreement provided that subject to certain terms and conditions each Employer should pay .07¢ per hour for each straight-time hour worked by each of its Employers by a contribution to a Health and Welfare Fund hereinafter referred to as the "Trust Estate" for the benefit of said Employers or other Employers provided, however, that the rate of contribution shall be in accordance with any further continuation of the Agreement or any further Agreement which may be entered into between the Union as hereafter defined:

WHEREAS, the Union has executed and may execute similar Collective Bargaining Agreements with individual Employers whether members of the Association or not, who are Employers of the members of the Union concerning contributions to said Trust Estate and,

WHEREAS, said Trust Estate in whole or in part could be used for certain group insurance benefits for eligible employees as deemed hereunder, and,

WHEREAS, the Agreement and Declaration of Trust made as of the twelfth day of April, 1954 by and between the aforementioned parties has from time to time been amended and,

WHEREAS, the said Agreement and Declaration of Trust is still in full force and effect and has been since the date first mentioned above, but during such period the Trustees have found it necessary to amend said Agreement and Declaration of Trust and,

WHEREAS, the Trustees, for purposes of clarity and administrative ease, deem it wise, desirable and beneficial to incorporate all of the amendments made to such Agreement and Declaration of Trust from April 12, 1954 through April 26, 1966, and to incorporate all of said amendments and certain other revisions deemed necessary by the Trustees into a revised Agreement and Declaration of Trust and,

WHEREAS, this instrument incorporates all of such amendments and,

WHEREAS, the Trustees, signatories hereto by their execution of this Agreement, hereby ratify the continuation of the aforementioned Trust and accept the Trust herein created and continued and declare that they will administer the same pursuant to the provisions hereof.

NOW THEREFORE, IN CONSIDERATION OF THE PREMISES AND THE COVENANTS HEREIN CONTAINED, THE ASSOCIATION, EACH EMPLOYER WHO IS OR BECOMES A PARTY TO THIS AGREEMENT, AND THE UNION SEVERALLY DECLARE THAT IT IS THEIR MUTUAL OBLIGATION TO ESTABLISH THE WITHIN TRUST FOR THE PURPOSE OF SETTING UP A HEALTH AND WELFARE PLAN PROVIDED FOR IN THE SAID AGREEMENT ABOVE REFERRED TO AND THAT THEY WILL DO ALL THINGS REQUIRED OF THEM TO DISCHARGE SAID OBLIGATION AND EFFECTUATE THE PURPOSES OF SAID TRUST AND WILL DO ALL THINGS HEREINAFTER SPECIFICALLY REQUIRED OF THEM, AND THE TRUSTEES DECLARE THAT THEY WILL RECEIVE AND HOLD CONTRIBUTIONS OR PAYMENTS AND ANY OTHER MONEY OR PROPERTY WHICH MAY COME INTO THEIR HANDS AS TRUSTEES HEREUNDER ALL SUCH FUNDS BEING HEREINAFTER REFERRED TO AS THE "TRUST ESTATE" WITH THE FOLLOWING POWERS AND DUTIES, FOR THE FOLLOWING USES AND PURPOSES, AND UPON THE FOLLOWING TERMS AND CONDITIONS:

## DEFINITIONS

1. The term "Employer," as used herein, shall include all employer members of the Association and in addition shall mean an employer of labor in the general trucking industry and other Employers who employ employees covered by contracts with the Union as defined in Paragraph 2 below and either (a) has in force or who executes an agreement with the Union providing for such Employer's participation in this Trust and his adoption of this Declaration of Trust, or (b) who shall, with the consent of the Trustees, execute a form furnished by the Trustees undertaking all the duties of an Employer participating in this Trust. The term "Employer" may also include the Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25 and related Trust Funds which provide benefits for employees covered by this plan.

It is understood and agreed that any Employer becoming an Employer under this Agreement, who shall not be a member of the Association, agrees to abide by all the provisions, rules and regulations set forth in any agreement involving the Trust Estate by and between the Association and the Union and agree that the Association shall be his representative in connection with the Trust Estate.

2.  The term "Employee" as used herein shall mean an Employee of an Employer hereunder who shall be covered by a collective bargaining agreement between the Association and the Union or between an Employer and the Union.

3.  The term "benefit" shall include such of the benefits authorized under Paragraph 8 as the Trustees shall determine are possible. There shall be no benefits paid for any occupational injury or illness compensable under any statute. In the event of a state or federal compulsory cash sickness benefit law, the benefits paid hereunder may, at the discretion of the Trustees, be reduced by the amounts paid under any such law.

4.  The term "Union" shall mean Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25, hereinafter referred to as the "Union."

5.  (a)  The term "Party to this agreement" shall include all Employer members of the Association and also any Employer who shall in writing accept the terms of this Trust and be accepted in writing by the Trustees and Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25.

(b)  The title of the Trust created herein shall be "Teamsters Union 25 Health Services & Insurance Plan."

## ADMISSION TO THE TRUST

6.  (a)  Any Employer of labor within the jurisdiction of the Union, not an original party to this Declaration of Trust, who employs Employees as defined in Paragraph 2 above may be permitted by the Trustees to become a party to this Declaration of Trust upon the condition that the said Employer shall subscribe to a collective bargaining agreement with the Union and to the terms of this Agreement.

## THE TRUST ESTATE

7.  The Trustees shall have the power to demand, collect and receive employer contributions or payments and other funds and may hold the same until applied to the ultimate purposes provided for in Paragraph 8 hereof, and may take such steps, including the institution and prosecution of or the intervention in any proceeding at law or in equity or in bankruptcy, as may be necessary or desirable to effectuate the collection of such employer contributions or payments and other funds to which said Trustees shall be entitled under the Agreements hereinbefore referred to.

8.  The Trustees shall hold, manage, invest and reinvest the Trust Estate for the following purposes and upon the following conditions:

(a)  The Trustees are authorized to maintain a self-insured fund, operate clinics or other facilities for health services, and/or to purchase policies of group insurance to be issued by an insurance company or companies duly authorized to conduct business in the Commonwealth of Massachusetts, providing for eligible employees and dependents only such benefits in amounts which the Trustees, in their sole discretion, deem necessary or desirable to best effectuate the purpose of this Trust.

Such policies may contain such provisions and be subject to such limitations and conditions as the Trustees, in their sole discretion, shall from time to time determine, and shall include such employees as the Trustees shall from time to time determine are eligible for receipt of such benefits, in accordance with the eligibility requirements under Paragraph 11.

(b)  The Trustees are authorized to provide, through self-insurance or clinics or other facilities for health services or to pay, or cause to be paid the premiums on group insurance policies providing benefits for temporary disability, hospital expense, surgical expense, medical expense, dental expense, optical expense, life insurance, and accidental death and dismemberment benefits and such other benefits and forms of group insurance as may be proper under Paragraph 8(a) and as the Trustees may determine from time to time; to insure such employees and their dependents as shall be eligible in accordance with the rules and regulations determined by the Trustees from time to time in accordance with the eligibility requirements under Paragraph 11. The policies of insurance may be contracted for in the name of and issued to the Trustees and may contain such provisions as the Trustees may determine.

2

(c) The Trustees are authorized to pay or cause to be paid all reasonable and necessary expenses of creating this Trust, of collecting the employer contributions or payments and other funds to which the Trustees may be entitled and of administering the affairs of this Trust, including the employment of such administrative, legal, expert and clerical assistance, purchase or lease of such premises, materials, supplies, and equipment, and the performance of such other acts as the Trustees, in their sole discretion, find necessary or appropriate in the performance of their duties.

(d) The Trustees are authorized to establish, hold, and accumulate such reserve funds as are necessary for the proper execution of the Trusts herein created.

(e) The Trustees are authorized to deposit all funds and monies received by them in such bank or banks in the Commonwealth of Massachusetts as they may select and with respect to such Reserve Funds as the Trustees are authorized to establish under Paragraph (d) of this Article, to appoint a national banking association or trust company each with a principal place of business in the Commonwealth of Massachusetts as Corporate Trustee to hold and invest and reinvest the Reserve Funds deposited with such Corporate Trustee under the terms of the expressed delegation of the Trustees' investment authority which are set forth in any applicable corporate trust agreement.

In investing the Reserve Funds held under Paragraph (d) of this Article the Trustees shall have full power to take any and all action with respect to holding, buying, selling, or maintaining such investments as they in their sole discretion may deem appropriate provided that no investment shall be made in any securities, of whatsoever nature or kind, of any Employer hereunder, or subsidiary or affiliate thereof; and subject to this provision the Trustees may delegate such investment authority to the Corporate Trustee.

(f) Notwithstanding any other provisions in this Agreement and Declaration of Trust, the Trustees are empowered to appoint Administrators to service policies of insurance purchased hereunder, to receive funds of the Trustees and to perform duties and exercise powers as may from time to time be agreed upon between the Trustees, including the lawful delegation of said responsibility, obligations or duties by said Trustees. Administrators, as used herein, shall include but not be limited to a Plan Administrator, Claim Administrator, and Accounting Administrator. The Trustees may also, by formal vote, appoint an Investment Manager who shall have such duties and responsibilities as may be determined by the Trustees and as is required by law.

## DUTIES OF EMPLOYER

9. Each Employer shall pay over to the Trustee, or their duly designated representative, not later than ten (10) days after the close of each work month a sum of money equal to the cents per hour required by the New England Freight Agreement and/or any other applicable collective bargaining agreement between the Union and any Employer as defined in Paragraph 1 during such work month. Such payment shall be accompanied by such reports as the Trustees in their sole discretion shall deem necessary or desirable in the administration of the Trust Estate.

10. The Trustees shall have the right to require such reports as are necessary for the fulfillment of this Declaration of Trust and the contracts of insurance, and without limiting the generality of the foregoing, each Employer and the Union (the members of which are covered by this agreement) shall promptly furnish to the Trustees on written demands such records of the employees as their names, social security number, payroll records and other information as may be necessary in connection with the administration of this Trust and said policies.

The Trustees may examine the pertinent records of each Employer at the Employer's place of business whenever they deem such examination to be necessary for the proper administration of the Trust Estate. The Trustees shall notify the Union and the Association and the appropriate Employer in the event any Employer shall be over more than twenty (20) days in default on any monthly payment, upon which occurrence an interest payment of ten (10) percent (10%) of the amount due plus all costs of collection incurred by the Trustees, including reasonable attorneys' fees, which in any event shall not be less than eighteen (18) percent (18%) and which shall attach to the original obligation.

22.   (a) No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees, acting in the manner herein provided, to administer the affairs of this Trust.

(b) In the event of the failure of any party to appoint a successor Trustee to fill a vacancy in the office of Trustee, which such party has the power to fill, for a period of thirty (30) days any two Trustees may petition a court of appropriate jurisdiction for an order requiring such a party to appoint a successor Trustee forthwith, and, in the event of the failure of said party to comply with such order, may petition a court of appropriate jurisdiction for the appointment of a successor Trustee to fill such vacancy.

23. (a) The Employer Trustees shall elect one of their number to be Chairman of the board and Union Trustees shall elect one of their number to be Secretary-Treasurer. In no event shall said office be occupied at the same time by two Trustees appointed by the same party.

(b) The Employer Trustees shall elect one of their number to be Co-Chairman, who shall serve in the absence of the Chairman, and the Union Trustees shall elect one of their number as Co-Secretary-Treasurer, who shall serve in the absence of the Secretary-Treasurer. In no event shall said offices be occupied at the same time by two Trustees appointed by the same party. The term of office under Paragraph 24 (a) and Paragraph 24 (b) shall be at the pleasure of the Trustees.

24.   (a) The Trustees shall meet in Boston, Massachusetts, at least annually.

(b) Any two Trustees may call a special meeting in Boston, Massachusetts, setting the time and place, by giving at least five (5) days' notice in writing to the remaining Trustees, provided, however, that the time and place for a special meeting may be determined by all the Trustees at any regular meeting held under (a) of this Article, without the necessity of giving any further notice.

25.   (a) Four (4) Trustees, provided two (2) Employer Trustees and two (2) Union Trustees are present shall constitute a quorum for the transaction of business.

(b) Any action taken by the Trustees shall be by the concurring vote of four (4) Trustees, provided, however, that at least two (2) of the Employer Trustees and two (2) of the Union Trustees vote for the passage of the action.

(c) In the event of a deadlock of the Trustees in any matter, including the administration of the Trust Estate, the Trustees shall agree on an impartial umpire to decide such dispute, or in the event of failure of the Trustees to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on the petition of two Employer Trustees, or two Employee Trustees, *be* appointed by the United States District Court for the District of Boston.

26.   The Trustees shall keep true and accurate minutes, books of account, and records of all their transactions as Trustees, which shall be audited annually, or more often, by a Certified Public Accountant. All checks, drafts, vouchers, or other withdrawals of funds from the account or accounts of the Trust Estate shall be countersigned by the Chairman and Secretary-Treasurer or by one of the Trustees from each group of Trustees, as resolutions for such purposes may be adopted by the Trustees. A copy of the audit shall be furnished to the Association and to the Union. A copy of the annual audit shall be available for inspection by interested persons at the principal office of the Trust Estate and at such other places, if any, as may be designated.

27.   (a) The Trustees shall by resolution provide bonding coverage for themselves, fiduciaries and every person who handles funds or other property of the Trust in accordance with applicable law and the Employee Retirement Income Security Act.

(b) The Trustees may provide insurance for the fiduciaries of the Trust or for itself to cover liability or losses occurring by reason of the act or omission of a fiduciary in accordance with applicable law and the Employee Retirement Income Security Act.

28.   No successor Trustees shall in any way be liable or responsible for anything done or committed in the administration of the Trust prior to the date they become a Trustee. The Trustees shall not be liable for the acts or omissions of any investment manager, attorney, agent or assistant employed by them in pursuance of this agreement, if such investment manager, attorney, agent or assitant was selected pursuant to this Trust Agreement and such person's performance was periodically reviewed by the Trustees who found such performance to be satisfactory; provided that nothing herein shall relieve any Corporate Trustee of any liability with regard to the performance of its employees.

37. This Agreement and Declaration of Trust may be revoked at any time by the unanimous consent of the Employers Group of Motor Freight Carriers, Inc., and Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25, Boston, Massachusetts. Revocation will take effect upon the execution of an instrument of revocation signed by the aforesaid consenting parties. Upon the termination in the foregoing manner, the Trustees shall apply the Trust Estate, in whole or in part, to the purposes specified in Paragraph 8 hereof, with regard to any employees who may be eligible thereunder at such time, and any part thereof which cannot be so applied shall be applied to such other purposes as, in the sole discretion of the Trustees, will best effectuate the purposes of this Trust, including without in any way limiting the generality of the foregoing the transfer of the Trust Estate to the Trustees of any Trust organized to fulfill the same general purposes as this Trust.

38. Nothing in this Agreement shall be construed so as to limit in any way the lawful rights of any of the parties hereto.

39. In the event that this Agreement and Declaration of Trust shall be amended or revoked, then the Trustees shall give such notice and take such other action as necessary to comply with all the applicable provisions of law including the Employee Retirement Income Security Act.

IN WITNESS WHEREOF, the undersigned parties have hereunto set their hands and seals this 25th day of July 1975.

Signed, Sealed, and Delivered
in the Presence of:

**FOR THE UNION:**

**UNION TRUSTEES:**

TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS UNION No. 25

s/WILLIAM J. McCARTHY

s/JOSEPH C. CONLON

s/WILLIAM T. LYDEN

**FOR THE ASSOCIATION:**

**EMPLOYER TRUSTEES:**

EMPLOYERS GROUP OF
MOTOR FREIGHT CARRIERS, INC.

s/SAMUEL D. KRINSKY, Chairman

s/ALBERT P. SAGANSKY

s/PAUL P. DOWLING

SUFFOLK, SS.

BOSTON, MASS.
July 25, 1975

Then personally appeared the above-named Trustees who did execute this revised Agreement and Declaration of Trust in my presence and did declare same to be their free act and deed.

Seal.

s/JAMES T. GRADY
Notary Public
My Commission expires August 23, 1979

7

## ACCEPTANCE PAGE

The undersigned Employer, having entered into a collective bargaining agreement with Teamsters, Chauffeurs, Warehousemen and Helpers Union No. 25, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which agreement provides, among other things, for contributions to the Teamsters Union 25 Health Services & Insurance Plan, agrees to be bound by the foregoing Agreement and Declaration of Trust and hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are named in said Agreement as Employer Trustees together with their successors selected in the manner provided in the within Agreement and ratifies and agrees to be bound by all actions taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust.

Dated: _11/8/78_

_Hall & Cole Produce Inc_
Employer

I certify and warrant that I am authorized to execute this acceptance on behalf of the above-named Employer.

By: _N. Benedict Hall Pros_
Name and Title

8

NOTICE OF NEW AGREEMENT
ON
HEALTH AND WELFARE

Date  February 18, 2000
Revised 4/11/03

FROM:  TEAMSTERS LOCAL UNION NO. 25

Name of Employer  The New England Produce Center

Address  (see attached list)

New Employer [ ]    or Renewal [ xx ]    or Extension [ ]

Effective Date of Agreement  **April 1, 1999**

Effective Dates and Rates of Contributions to the Health and Welfare Fund

Date  **April 1, 1999**    Rate  **$3.76 1/4**    /hr.

Date  **April 1, 2000**    Rate  **4.16 1/4**    /hr.

Date  **April 1, 2001**    Rate  **4.41 1/4**    /hr.

Date  **April 1, 2002**    Rate  **4.46 1/4**    /hr.
      **April 1, 2003**          **4.71 1/4**

Expiration Date  **March 31, 2003 4**

Number of Employees  **79**

Copy of Contract _____ is enclosed.    [ xx ]

Teamsters Local No. 25 Health and Welfare Fund Agreement and
Declaration of Trust Booklet signed by the above named Employer
enclosed.    [ ]

_Mark Harrington/ Lou DiGiampaolo_
Signature

**Mark Harrington/Lou DiGiampaolo**
**Business Agent/Field Representative**
Title

* **PLEASE NOTE:**
     Enclosed please find copy of signed contract.

|  |  | PENSION | TITAN EMPLOYER NO. |
|---|---|---|---|
| 1. | Bay State Produce Co., Inc.<br>21-24 N.E. Produce Center<br>Chelsea, MA  02150 | 25-665 | #002169750 |
| 2. | D'Arrigo Bros. Co. of Mass., Inc.<br>105 N.E. Produce Center<br>Chelsea, MA  02150 | 25-674 | #004064600 |
| 3. | John Cerasuolo Co. , Inc.<br>38 N.E. Produce Center<br>Chelsea, MA  02150 | 25-666 | #003319945 |
| 4. | Hall & Cole Produce, Inc.<br>11-13 N.E. Produce Center<br>Chelsea, MA  02150 | 25-878 | #008050600 |
| 5. | Mutual Produce, Inc.<br>48-49 N.E. Produce Center<br>Chelsea, MA  02150 | 25-679 | #013722600 |
| 6. | Arthur G. Silk, Inc.<br>IMCN, POB 6455<br>44 N.E. Produce Center<br>Chelsea, MA  02150 | 25-682 | #019419180 |
| 7. | S. Strock & Co., Inc.<br>IMC North POB 6113<br>61-64 N.E. Produce Center<br>Chelsea, MA  02150 | 25-683 | #019778150 |
| 8. | P. Tavilla Co., Inc.<br>78 N.E. Produce Center<br>Chelsea, MA  02150 | 25-684 | #020045750 |

COMPANIES SIGNATORY TO THE BOSTON AREA TERMING

|  | PENSION | TITAN EMPLOYER NO. |
|---|---|---|
| 1. Community Suffolk, Inc.<br>304 Second Street<br>Everett, MA 02149 | 25-672 | #003579760 |

Agreement

between

New England Produce Center & The Boston Market Terminal

and

Teamsters Union Local No. 25

Last revision date: December 3, 1999

INDEX

Page

ARTICLE I - UNION RECOGNITION AND UNION SECURITY . . . . . . . . . . . . . 1

ARTICLE II - STEWARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE III - LEAVE OF ABSENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE IV - SENIORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE V - EXTRA-CONTRACT AGREEMENTS . . . . . . . . . . . . . . . . . . 9

ARTICLE VI - GRIEVANCE PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE VII - PROTECTION OF RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VIII - DISCHARGE OR SUSPENSION . . . . . . . . . . . . . . . . . . . . 11

ARTICLE IX - PAYROLL PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE X - SUNDAYS AND HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE XI - VACATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XII - MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE XIII - HOURS OF WORK AND OVERTIME . . . . . . . . . . . . . . . . 20

ARTICLE XIV - WAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE XV - HEALTH AND WELFARE FUND . . . . . . . . . . . . . . . . . . . 24

ARTICLE XVI - SICK LEAVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE XVII - PENSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE XVIII - MANAGEMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE XIX - NON-DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE XX - NO STRIKE -- NO LOCKOUT . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE XXI - SEPARABILITY AND SAVINGS PROVISIONS . . . . . . . . . 37

ARTICLE XXII - TERMINATION AND RENEWAL . . . . . . . . . . . . . . . . . . . 37

## AGREEMENT

The undersigned members of the NEW ENGLAND PRODUCE CENTER AND THE BOSTON MARKET TERMINAL, hereinafter called the "EMPLOYERS," and TEAMSTERS UNION LOCAL NO. 25, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, hereinafter called the "UNION," agree to be bound by the terms and provisions of this Agreement.

## ARTICLE I

## UNION RECOGNITION AND UNION SECURITY

(a)     The Employers recognize and acknowledge that the Union is the exclusive representative of all regular employees engaged in the loading, unloading and delivery of merchandise as provided by the National Labor Relations Act.

(b)     All present employees who are members of the Union on the effective date of this Agreement shall remain members of the Union in good standing as a condition of employment.  All present employees who are not members of the Union, and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the 31st day following the beginning of their employment, or on and after the 31st day following the effective date of this Agreement or the date of execution of this Agreement, whichever is the later.

(c)     When an Employer needs additional men, he shall give the Union equal opportunity with all other sources to provide suitable applicants, but the Employer shall not be required to hire those referred by the Union.

(d)    The Employers agree to deduct from the pay of all employees covered by this Agreement the dues, initiation fees and/or uniform assessments of the Local Union having jurisdiction over such employees and agree to remit to said Local Union all such deductions taken from the 1st payroll period of each month and remit to the Local Union by the 2nd payroll period of each month. Where laws require written authorization by the employee, the same is to be furnished in the form required. No deduction shall be made which is prohibited by applicable law. Where an employee who is on check-off is not on the payroll during the week in which the deduction is to be made or has no earnings or insufficient earnings during that week or is on a leave of absence, the employee must make arrangements with the Local Union to pay such dues in advance.

(e)    The Employers will recognize authorization for deductions from wages, if in compliance with State law, to be transmitted to the Union or to such other organizations as Union may request if mutually agreed to, except DRIVE deductions which shall be made annually. No such authorization shall be recognized if in violation of State or Federal law. No deductions shall be made which are prohibited by applicable law.

(f)    The Employer agrees to deduct certain specified amounts each week from the wages of those employees who shall have given the Employer written authorization to make such deduction to be remitted to the Teamsters Local 25 FEDERAL CREDIT UNION once a week. The Employer shall not make deductions and shall not be responsible for remittance to the Credit Union for any deductions for

-2-

those weeks during which the employee has no earnings or in those weeks in which the employee's earnings shall be less than the amount authorized for deduction.

(g)    Nothing contained in this Agreement shall be construed so as to require any Employer or employee to violate any applicable law.

ARTICLE II

STEWARDS

(a)    The Employers recognize the right of the Union to designate one shop steward and one alternate per plant of an Employer from the Employer's seniority list.

(b)    The authority of shop stewards and alternates, so designated by the Union, shall be limited to and shall not exceed the following duties and activities:

(1)    The investigation and presentation of grievances to his Employer or the designated Employer representative in accordance with the provisions of the collective bargaining Agreement;

(2)    The collection of dues when authorized by appropriate Union action;

(3)    The transmission of such messages and information which shall originate with, and are authorized by the Union, or its officers, provided such messages and information

1.    Have been reduced to writing, or

2.    If not reduced to writing, are of a routine nature and do not involve work stoppage, slowdowns, refusal to handle goods, or any other

interference with the Employer's business; provided, however, that the activities referred to in (1), (2) and (3) shall not be performed in such fashions as to conflict with the steward's work duties.

(c)    The Union reserves the right to remove the Shop Steward at any time for the good of the Union.

(d)    Stewards shall be granted super-seniority for all purposes including layoff.

(e)    Shop stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.

(f)    The Employers recognize these limitations upon the authority of shop stewards and their alternates, and shall not hold the Union liable for any unauthorized acts. The Employers in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the shop steward or alternate has taken unauthorized strike action, slowdown or work stoppage, refusal to handle goods, or any other interference with the Employer's business, in violation of this Agreement.

(g)    Stewards shall be permitted to investigate and present grievances to his Employer on the property of the Employer, without loss of time or pay for the time so spent during his scheduled working hours. Such time spent in handling grievances with his Employer shall be considered working hours in computing daily and/or weekly overtime.

-4-

## ARTICLE III

## LEAVE OF ABSENCE

(a)    The Employers agree to grant the necessary and reasonable time off, not to exceed thirty (30) days, without discrimination or loss of seniority rights and without pay, to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business, provided forty-eight (48) hours' written notice is given to the Employer by the Union, specifying length of time off. The Union agrees that, in making its request for time off for Union activities, due consideration shall be given to the number of men affected in order that there shall be no disruption of the Employer's operations due to lack of available employees.

(b)    Any employee desiring leave of absence from his employment, without pay or other benefits, must secure written permission from both his Employer and the Union. The maximum leave of absence shall be for thirty (30) days and may be extended for like periods. Permission for extension must be secured from both the Union and the Employer. During the period of absence, the employee shall not engage in gainful employment. Failure to comply with this provision shall result in the complete loss of seniority rights for the employees involved. Inability to work because of proven sickness or injury shall not result in such loss of seniority rights, subject to the provisions of Article IV.

ARTICLE IV

SENIORITY

Section 1

(a)    Seniority for regular employees governed by this Agreement shall be defined as the period of employment with their Employer in the work covered by this Agreement, at the plant within the jurisdiction of the Union.  It shall be deemed to include any seniority presently held by a regular employee through agreement between the Employer and the Union prior to this Agreement.

(b)    All new employees shall be hired on a sixty (60) consecutive calendar days' trial basis and shall work under the provisions of this Agreement, within which time they may be dismissed without protest by the Union.  After said sixty (60) days' trial period they shall be placed on the seniority list of their Employer as regular employees in accordance with their date of hire, provided, however, that an employee must actually work a minimum of thirty-five (35) days within his said sixty (60) days' trial period.

(c)    In the event of layoff or recall to work after layoff, preference shall be given to regular employees older in service in order of their seniority to the work available, the most junior employee being the first laid off and rehiring being in the inverse order of seniority, provided that such employees are available at such time as the work is assigned and are qualified to perform the work required.

(d)    An employee called to work before his assigned report time shall not be required to take time off to compensate therefor.

-6-

(e)    An employee shall be notified of a layoff no later than at the end of his tour of duty on Wednesday of that work week.

(f)    In the event of a recall of an employee laid off the laid off employee shall be given notice, at least the night before, of recall by telephone or telegram or present method of personal contact or by letter, to the address last given the Employer by the employee.  An employee recalled by the above procedure must notify the Employer as soon as possible in advance, of the specified time for his report of his intention to report.  In the event the employee fails to comply with the above provision he shall have no claim for work opportunity lost until he reports, but the Employer shall be responsible for the work opportunity lost if he shall fail to comply with these provisions.

Section 2

(a)    Loss of seniority

Seniority shall be broken only by:

(1)    Discharge.

(2)    Voluntary quit.

(3)    Unauthorized leave of absence.

(4)    Unauthorized failure to report for work for three (3) consecutive days when work is available.

(5)    Failure to respond to a notice of recall as specified in Section 1 (f) of this Article within five calendar days after receipt of notice of recall.

(6)    Layoff for a period exceeding three (3) years.

-7-

(b)    Any employee who is absent because of proven illness or injury shall maintain his seniority.  However, if there is a question of fitness by the Employer, the employee's physical fitness shall be determined by an impartial physician whose report shall be final and binding.  The impartial physician shall be selected by agreement between the Union and Employer.

Section 3

Military Clause

Employees enlisting or entering the military or naval service of the United States, pursuant to the provisions of the Selective Service Act of 1948, shall be granted all rights and privileges provided by the Act.

Section 4

Within thirty (30) days after the signing of this Agreement, a list of employees arranged in the order of their seniority shall be posted in a conspicuous place at their place of employment, and a copy furnished to the Union.  Claims for corrections to such lists must be made to the Employer and the Union within ten (10) days after such posting and after such time the lists will be regarded as correct.  Any dispute if raised within the ten (10) day period concerning an employee's seniority shall be referred to the Grievance Procedure as provided herein.

Section 5

Employees in order of their seniority shall have preference in selection of starting time provided they are able and qualified.

## ARTICLE V

## EXTRA-CONTRACT AGREEMENTS

The Employers agree not to enter into any agreement or contract with their employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

## ARTICLE VI

## GRIEVANCE PROCEDURE

Any difference, dispute or grievance (hereinafter referred to as a grievance) concerning the interpretation or application of the provisions of this Agreement on the part of any employee or the Union shall be processed under this Grievance Procedure as follows:

Step 1:  By discussions between the aggrieved employee and/or his shop steward and the designated representative of his Employer.  The employee must notify his shop steward and his Employer of the grievance within five (5) working days from the day the grievance arose.  If the grievance is not satisfactorily settled, the grievance must be submitted in writing by the employee or the shop steward to the Business Representative of the Union and to the Company within thirty (30) working days from the day the grievance arose.

Step 2:  The Business Representative of the Union shall take the grievance up with the designated representative of the Employer.  If, within ten (10) working days from the day the grievance should be submitted in writing, no satisfactory settlement has been reached, the grievance may, at the request of the Union, be referred for

arbitration. The Union must notify the Employer in writing of its decision to request that the grievance be referred for arbitration within the ten (10) working days. Upon the mutual agreement of the Union and the Employer, be referred to the Tri-State Grievance Panel for arbitration. If either of the parties does not agree to submit the grievance to the Tri-State Panel, the grievance shall, at the request of the Union, be referred to the Federal Mediation and Conciliation Service ("FMCS") for arbitration.

In the event the grievance is referred to FMCS, the parties shall agree to a list of arbitrators from which the union and employer involved may select an arbitrator. If the union and the employer are unable, within five (5) working days, to agree on the arbitrator, either the union or the employer may refer the matter of the appointment of the arbitrator for the grievance in issue to the Federal Mediation and Conciliation Service, which shall appoint the arbitrator for the grievance in issue as promptly as possible.

The decision of the arbitrator shall be final and binding on all parties and persons concerned. The fees and expenses of the arbitrator shall be borne equally by the Union and the Employer. Failure to submit a grievance in writing or to process it under the Grievance Procedure within the time limits specified shall be deemed a waiver of the grievance and shall constitute a final and binding termination of the grievance. For purposes of computing the specified time limits in this Article, Saturdays, Sundays and holidays are not counted as working days.

In making his decision, the arbitrator shall be bound and governed by the provisions of this Agreement and shall have no power to add to or subtract from or

-10-

modify any of the provisions of this Agreement. Questions of back pay shall be left to the arbitrator.

## ARTICLE VII

### PROTECTION OF RIGHTS

(a)     It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party of this Agreement, and including primary picket lines at the Employer's places of business.

## ARTICLE VIII

### DISCHARGE OR SUSPENSION

Employer shall not discipline or suspend or discharge any regular employee without just cause. Any employee who feels aggrieved by any such disciplinary action, suspension, or discharge may file a grievance which shall be taken up under the Grievance Procedure as provided herein, provided, however, that any such grievance must be submitted to the Employer in writing not later than seven (7) calendar days from the day the grievance arose. An Employer shall notify employee of disciplinary action within seven days of its knowledge of the occurrence of the incident on which the discipline is based. An Employer shall not suspend any regular employee prior to notifying the Union of the reason for such suspension and providing the Union with the opportunity, not to exceed forty-eight (48) hours, to

discuss the suspension, provided, however, that an employee who engages in serious misconduct or who reports for work impaired by drugs, alcohol, or prescription or non-prescription medication, or who becomes impaired by such substances while at work, shall immediately be suspended without prior notice to the Union.

ARTICLE IX

PAYROLL PERIOD

(a)    The payroll period shall be run from Sunday to Saturday inclusive with payday not later than Friday of the next week. Each employee shall be provided with a statement of gross earnings and an itemized statement of deduction made for any purpose each week. When the regular payday occurs on a holiday or day observed as such, the Employer shall pay the employee on the regular work day immediately preceding the holiday.

(b)    Spare employees to be paid daily at the end of their tour of duty if they so request or on Friday of the week worked.

ARTICLE X

SUNDAYS AND HOLIDAYS

(a)    The following shall be recognized as paid holidays:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Memorial Day |
| Independence Day | Thanksgiving Day |
| Labor Day | Christmas Day |

A holiday listed above shall be considered to be the calendar day on which it is observed under applicable state law.

-12-

(b)    Regular employees shall be paid for each recognized holiday listed above in paragraph (a), or the day observed as such, on the basis of eight (8) hours at their straight-time rate, provided they work any day during the payroll period and are not absent on the day before or the day after a holiday. Employees who qualify for a said holiday and are required to work on any such holiday shall be paid time and one-half (1 1/2) the normal rate, in addition to the holiday pay for which they are eligible.

(c)    If any of the holidays listed in paragraph (a) occur or are observed when a regular employee is on vacation, he shall receive an extra day's pay in lieu of the holiday or the Employer by mutual agreement with the employee involved may permit him to leave for vacation one day earlier or to return one day later.

(d)    All time worked by employees on Sundays or on holidays listed above in paragraph (a), as such, shall be paid for at one and one-half (1 1/2) times the normal rate as shown in the Wage Rate Schedule herein.

(e)    Employees on night shift work whose regular work begins on a Sunday or holiday evening or ends on a Sunday or holiday morning, shall be given either the night before or the night after off, for their Sunday or holiday, in accordance with their work schedules. Except in cases specifically agreed upon between the Employer and the Union, work on a night shift for purposes of any provisions of this Agreement shall be treated as being performed on the day on which the shift ends.

(f)    Employees shall have one (1) personal day off each year. A veteran may use his personal day on Veterans Day if he so elects.

ARTICLE XI

VACATION

(a)    Vacation eligibility shall be determined as of the anniversary date of an employee's employment as a regular employee.  Every regular employee who is in the service of his Employer for one (1) year or more from the date of his employment shall be entitled to one (1) week's vacation with each week's pay based upon 1/52 of his earnings for time worked during the twelve months ending on December 31 prior to the vacation period but in no event less than forty (40) hours at his current straight time hourly rate; provided, however that any such employee to become eligible for a yearly vacation must have actually worked for his Employer during said yearly vacation period immediately preceding his anniversary date at least one hundred thirty-five (135) days.  Every regular employee who is in the service of his Employer for two (2) years or more from the date of his employment shall be entitled to two (2) weeks' vacation with each week's pay based upon 1/52 of his earnings for time worked during the twelve months ending on December 31 prior to the vacation period but in no event less than forty (40) hours at his current straight time hourly rate; provided, however, that any such employee to become eligible for a yearly vacation must have actually worked for his Employer during said yearly vacation period immediately preceding his anniversary date at least one hundred thirty-five (135) days. Every regular employee in the service of his Employer for eight (8) years or more from the date of his employment shall be entitled to three (3) weeks' vacation with each week's pay based upon 1/52 of his earnings for time worked

-14-

during the twelve months ending on December 31 prior to the vacation period but in no event less than forty (40) hours at his current straight time hourly rate; provided, however, that any such employee to become eligible for a yearly vacation must have actually worked for his Employer during said yearly vacation period immediately preceding his anniversary date at least one hundred thirty-five (135) days. Every regular employee in the service of his Employer for eighteen (18) years or more from the date of his employment shall be entitled to four (4) weeks' vacation with each week's pay based upon 1/52 of his earnings for time worked during the twelve months ending on December 31 prior to the vacation period but in no event less than forty (40) hours at his current straight time hourly rate; provided, however, that any such employee to become eligible for a yearly vacation must have actually worked for his Employer during said yearly vacation period immediately preceding his anniversary date at least one hundred thirty-five (135) days.

 (b) Vacations shall be scheduled during the period between January 1 and December 31, except that an Employer may designate certain weeks of the year, for good business reasons, as weeks during which no employee may schedule a vacation. The Employer shall designate such weeks by December 1 of the year prior to that for which the employees are designating their vacations. Vacations may be selected on a list of eligible employees, which shall also be posted by the Employer by December 1.

 Employees shall select vacation weeks for the following year in order of their seniority, and shall designate such weeks by December 15. The senior eligible employee shall be given his first choice of weeks of vacation.

The vacation schedule shall be posted by the Employer by December 31 of each year. No more than one employee may be out on vacation at any one time except by mutual agreement.

(c)    Upon discharge by an Employer or quit by an employee, earned vacation time and pay shall be included in all final wage payments. In case of death of an employee who is eligible for a vacation, vacation pay due such an employee shall be paid to the employee's estate.

(d)    Each employee eligible for a vacation with pay shall be entitled to no more than one such paid vacation between two consecutive anniversary dates.

### ARTICLE XII

### MISCELLANEOUS

(a)    When an employee is required to appear in any court for the purpose of testifying, because of any accident he may have been involved in during working hours in the course of his employment, such employee shall be reimbursed in full by the Employer for all earning opportunity lost because of such appearance. The Employer shall furnish the employee who is involved in an accident during working hours during the course of his employment, with bail, bond and legal counsel, and shall pay in full for same. Said bail, bond and legal counsel shall remain assigned to the employee until all legal action in connection with said accident is concluded, provided the employee is not charged or convicted of criminal negligence. This paragraph shall not apply to employees who are found guilty of drunken driving

when involved in an accident during working hours in the course of their employment.

(b)    All physical or identification examinations when required by the Employer and performed under his direction shall be paid for by the Employer. Employees shall be paid for all time required to take all such examinations.

(c)    If the Employer requires employees to wear uniforms, said uniforms shall be paid for and laundered by the Employer. Employer shall furnish gloves, rubber aprons, rubber hats, jacket and pants (raingear) whenever required by the job being performed. Employees shall be responsible for such items furnished to them.

(d)    If the Employer requires employees to carry personal identification, the cost of such personal identification shall be borne by the Employer.

(e)    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of determining whether or not the terms of this Agreement are being complied with. The Employer will provide bulletin board space for posting of information of interest to employees of the bargaining unit.

(f)    When a regular employee is injured on the job, he shall be guaranteed eight (8) hours' pay for the day injured, provided he is instructed to cease work as a result of an injury by the Employer or his physician. If required to visit hospitals, clinics, doctors' offices or other places for treatment or diagnosis, during days he is working, during working hours, he shall be paid for the time involved in travel and treatment with a guarantee of eight (8) hours.

(g)    In the event of a death in a regular employee's immediate family, i.e., father, mother, sister, brother, son, daughter, husband, wife, father-in-law or mother-in-law, it is recognized by the parties that the employee may need time off to attend the funeral services. A leave of absence will be granted to the employee for the day of burial and the two (2) days preceding the day of burial. When these days fall during the employee's scheduled working days within the period from Monday through Friday, the employee shall suffer no loss in pay, exclusive of overtime, and shall be paid by the Employer at his regular straight-time rate of pay for eight (8) hours per day of such absence. When an employee requests leave to attend the funeral of a grandparent or grandchild, only one (1) day's pay shall be granted under the above conditions.

(h)    The term "regular employee" as used throughout this Agreement means a full-time employee who has completed his trial period in the employ of his Employer. A part-time or casual or temporary employee is not included in said term and shall not be considered a "regular employee" for purposes of this Agreement.

(i)    There shall be no pyramiding or duplication of overtime or premium pay or benefits under any provisions of this Agreement.

(j)    1.    The general wage increase as provided in Article XIV of this Agreement shall be given to regular employees in addition to (on top of) their present hourly wage rates.

2.    Any regular employee who has heretofore been entitled to an annual vacation of longer duration than as provided for in Article XI of this

-18-

Agreement shall continue to receive such longer vacation period for which he otherwise qualifies without reduction.

3.    Any and all bonuses and/or holiday or year-end gifts are matters to be determined by the Employer unilaterally in the Employer's sole discretion and judgment.

4.    The Employer will provide gloves as they are necessary to perform the required work.  Lost gloves will be replaced by the employee; worn gloves will be replaced by the Employer when they are turned in by the employee for replacement.

5.    No other Employer shall be bound or obligated by the voluntary acts or practices of another Employer when he may exceed the terms and provisions of this Agreement.

6.    No past practices, except as and to the extent adopted and specifically set forth in this Agreement, shall apply for purposes of any employee or employees asserting or claiming benefits and/or privileges.

7.    The Employer may request operational changes about which there was no agreement previously reached during negotiations in order to improve operations, obtain greater efficiencies, achieve labor savings or meet competitive changes.  The parties agree that they shall negotiate concerning such requests and that in the event the parties are unable to reach agreement, the matter shall be submitted for interest arbitration.  The arbitrator shall be selected by either the Union

or an Employer in accordance with the procedure described in Article VI. The
decision of the arbitrator shall be final and binding upon the parties in all respects.

## ARTICLE XIII

### HOURS OF WORK AND OVERTIME

Section 1

(a)    Five (5) days shall constitute a normal week's work for all regular
employees from Monday to Friday inclusive, and the hours of labor each day shall be
worked in uninterrupted succession.  All time worked in excess of eight (8) hours per
day or forty (40) hours in any work week shall be paid for as overtime at one and
one-half (1 1/2) times the normal rate.

Section 2

(a)    All time worked by employees starting prior to commencement of the
work shift shall be paid time and one-half provided that they complete their
respective tours of duty as set forth hereunder.

Section 3

(a)    The Employer shall assign to each regular employee fixed starting times;
provided, however, that any starting times may from time to time be changed by the
employer upon giving the employee affected at least thirty-six (36) hours' advance
notice, except that in an emergency starting times may be varied upon reasonable
notice.  Fixed starting times for regular employees may be staggered and for any
regular employee may vary for each particular day as set forth in his weekly work
schedule.

-20-

(b)    An employee who is required to report for work before his scheduled starting time will be given a total of eight hours of work which shall include the time preliminary to his scheduled starting time at time and one-half and his scheduled hours at straight time. For example, if his scheduled starting time is 4 a.m. and he is called in at 3 a.m., he will receive one hour of work at time and one-half and seven hours at straight time. As an additional example, an employee who is scheduled to start at 4 a.m. and who is called in at 3:30 a.m. is guaranteed a total of eight hours inclusive of the half hour before 4 a.m. of which time one half hour will be at time and one half and seven and one half hours will be at straight time; if the Company requires him to work a total of nine hours beginning at 3:30, he will receive overtime for the first half hour and the last half hour and straight time for eight hours.

Section 4

(a)    A daily time record shall be maintained by the Employer for all of his employees covered by this Agreement. If an Employer installs a time clock, each employee shall punch his own time card at the start of the day and punch out his own time card at the completion of the day's work at the Employer's place of business.

Section 5

(a)    Any employee who is called or reports as scheduled and is available to do the work offered shall be guaranteed a minimum of eight (8) hours' work or pay in lieu thereof; provided, however, that on Saturdays and Sundays, the said daily

guarantee shall be for a minimum of two (2) hours' work or pay in lieu thereof with pay for actual hours worked thereafter.

(b)    All time worked by employees on Saturdays (or on the sixth report in a payroll period), as such, shall be paid for at one and one-half (1-1/2) times the normal rate as shown in the Wage Rate Schedule herein.

(c)    Any regular employee who is called or reports as scheduled as of Monday of the work week and is available to do the work offered shall be guaranteed forty (40) hours' of work that week or pay in lieu thereof.  In any week in which the paid holidays fall on a regular work day, the guaranteed work week for any such employee shall be forty (40) hours of work or pay in lieu thereof less the amount paid for the paid holiday(s).  If the paid holiday falls on the sixth day of the work week, the guaranteed work week shall be forty (40) hours of work or pay in lieu thereof in addition to the holiday pay.

(d)    All compensated hours, whether for time worked or not worked but paid for shall be credited toward an Employer's fulfillment of the said daily and weekly guarantees as set forth in this Section 5; provided, that said guarantees shall be reduced by an employee's absences, including absences for all personal reasons, by the time lost from work thereby; and provided, further, that said guarantees shall not apply in the event that strikes, any other work stoppages in connection with labor disputes, causes beyond the control of the Employer, or acts of God, interfere with work being provided.

ARTICLE XIV

WAGES

Hourly wage rates for regular full-time employees as set forth in the following Wage Rate Schedule shall become effective as follows for such employees who are on the company's regular payroll for more than eighteen months on the date of execution of this Agreement and such employees who shall transfer from one signatory company to another signatory company shall continue to receive said rates:

| April 1, 1999 | April 1, 2000 | April 1, 2001 | April 1, 2002 | April 1, 2003 |
|---|---|---|---|---|
| $14.30 | $14.55 | $14.85 | $15.10 | $15.35 |

For new employees, the minimum hourly rate shall be under the above wage rates by four dollars ($4.00) for the first year of their employment, by three dollars ($3.00) for the second year of their employment, by two dollars ($2.00) for the third year of their employment, by one dollar ($1.00) for the fourth year of their employment and shall be equal to the above rates after four (4) years of employment. Such new employees who transfer from one company signatory to this Agreement to another company signatory to this Agreement at any time within the four (4) years after their initial hire by a company signatory to this Agreement will receive credit toward the above progression rates for the time of his employment during such four (4) years in the employ of any company signatory to this Agreement. The Employer may pay an employee more than the minimum hourly rates set forth above.

The money necessary to fund any increase in the employees' health insurance contribution under Article XV greater than twenty-five cents ($.25) in effect after

April, 2003 shall be deducted from the hourly rate. In the event the health c

contribution increase in effect after April, 2003 is less than twenty-five cents (

there shall be no increase in wages and the Employers shall receive the entire benefit

of this reduction.

## ARTICLE XV

## HEALTH AND WELFARE FUND

(a)     Commencing with the first day of April, 1999 and for the duration of

the current Collective Bargaining Agreement and any renewals or extensions thereof,

the Employer agrees to make payments to the respective Health and Welfare Funds

for each and every employee performing work within the scope of and/or covered

by this Collective Bargaining Agreement whether such employee is a regular,

probationary, temporary or casual employee, irrespective of his status as a member or

non-member of the Local Union from the first hour of employment subject to this

Collective Bargaining Agreement as follows:

Commencing with the first day of April, 1999, the Employer shall contribute to

the respective Health and Welfare Funds the sum of three dollars and seventy-six

and one-quarter cents ($3.7625) per hour figured to the nearest quarter hour for

which an employee covered by this Agreement receives pay up to a maximum of

forty (40) hours but not more than one hundred fifty dollars and fifty cents ($150.50)

per week for any one employee.

Commencing with the first day of April, 2000, the Employer shall contribute to

the respective Health and Welfare Funds the sum of four dollars and sixteen and

-24-

one-quarter cents ($4.1625) per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than one hundred sixty-six dollars and fifty cents ($166.50) per week for any one employee.

Commencing with the first day of April, 2001, the Employer shall contribute to the respective Health and Welfare Funds the sum of four dollars and forty-one and one-quarter cents ($4.4125) per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than one hundred seventy-six dollars and fifty cents ($176.50) per week for any one employee.

Commencing with the first day of April, 2002, the Employer shall contribute to the respective Health and Welfare Funds the sum of four dollars and forty-six and one-quarter cents ($4.4625) per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than one hundred seventy-eight dollars and fifty cents ($178.50) per week for any one employee.

Commencing with the first day of April, 2003, the Employer shall contribute to the respective Health and Welfare Funds the sum of four dollars and seventy-one and one-quarter cents ($4.7125) per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than one hundred eighty-eight dollars and fifty cents ($188.50) per week for any one employee.

-25-

(b)    Commencing with the first day of April, 1999 and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the respective Health and Welfare Funds as follows:

(1)    The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of all regular employees who may be on layoff status during any payroll period but have completed three (3) days of work in that payroll period.

For purposes of this Article, each hour paid for or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is received by the employee shall be counted as hours for which contributions are payable.

If a regular employee is absent because of illness or off-the-job injury and notifies the Employer of such absence, the Employer shall continue to make the required contribution of thirty-two (32) hours for a period of four (4) weeks.  If a regular employee is injured on the job, the Employer shall continue to pay the required contributions until such employee returns to work; however, such contributions of thirty-two (32) hours shall not be paid for a period of more than twelve (12) months.

Hourly contributions to the Health and Welfare Fund must be made for each hour worked on each regular or extra employee, even though such employee may work only part time under the provisions of this contract, including weeks where

-26-

work is performed for the Employer but not under the provisions of this Agreement and although contributions may be made for those weeks into some other Health and Welfare Fund.

All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Welfare Fund.

If an Employer fails to make contributions to the Welfare Fund within seventy-two (72) hours after the notice of delinquency set forth in this Agreement, the Local Union shall take whatever steps are necessary to secure compliance with this Article, any provisions of this Agreement to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payments due together with attorney's fees and such penalties which may be assessed by the Trustees. The Employer's liability for payment hereunder shall not be subject to the grievance procedure or arbitration provided under this Agreement.

(c) The Employers and Union which are signators hereto ratify the designation of the Employer and the Employee Trustees under such Agreement, and ratify all action already taken or to be taken by such Trustees within the scope of their authority.

(d) All Employers contributing hereunder shall post each month at each terminal or other place of business where employees have easy access thereto an exact copy of the remittance report form of contributions sent to the Fund.

(e)    Whenever an Employer signatory to this Agreement becomes delinquent in contributions owed to the Health and Welfare Fund and the Local Union serves a 72-hour notice of delinquency set forth in this Agreement, such Employer after satisfying the delinquency and becoming current, and then during the term of this Agreement becomes delinquent again, shall be required to post a performance bond to satisfy that second delinquency and/or any further delinquencies during the term of this Agreement.

(f)    In the event the Negotiating Committee for the National Freight Agreement shall decide to apply additional increases to the Health and Welfare Fund, the Employer shall upon receipt of written notice from the Union increase its contributions to the Teamsters Local No. 25 Health and Welfare Fund in the amount indicated on the same effective dates.

## ARTICLE XVI

## SICK LEAVE

Eligible employees shall receive sick leave benefits up to a maximum of (i) seven and one-half (7 ½) sick days for the period from April 1 through December 31, 1999 and (ii) ten (10) days per calendar year beginning January 1, 2000, subject to and in accordance with the following terms and conditions:

(1)    Employees eligible for sick leave benefits shall be regular employees.

(2)    Sick leave pay shall be computed on the basis of an eight (8) hour day.

-28-

(3)    Sick leave benefits shall not be cumulative from one calendar year period to the next nor shall unused sick leave benefits be paid for at the end of any calendar year period, except that unused sick days up to five days in a contract year will be paid to employees on the active payroll on December 15 in each year at the normal rate of pay based on an eight hour day. The sick days as set forth in the contract will be paid for from the first day for each illness or accident but will not be paid for the work day before or the work day after a paid holiday.

(4)    The employee must notify his Employer promptly of his sickness and furnish reasonable corroboration of same, including a doctor's certificate if requested by the Employer and reasonably required.

(5)    Sick leave benefits shall not be payable to an employee while on leave of absence, vacation or layoff.

(6)    There shall be no duplication of pyramiding of sick leave benefits. Sick leave benefits shall not apply where the employee is covered under a Workers' Compensation Act or the like legislation or when the employee receives compensation for the day under this Agreement, such as a paid holiday. Sick leave benefits shall be tied in and integrated with the weekly accident and sickness benefits coverage under the Health and Welfare Fund (Article XV). If an employee is entitled to benefits under the Health and Welfare Fund plan on the first day of an accident, the sick leave benefits under this Article shall be deferred and shall take effect after the benefits provided under the Health and Welfare Fund coverage have been used up. If an employee is entitled to benefits under the Health and Welfare Fund plan

for non-occupational sickness on a deferred basis, presently payable as of the eighth (8th) day of disability, the sick leave benefits under this Article shall apply for the initial waiting period until the benefits under the Health and Welfare Fund plan become payable and shall resume application after the Health and Welfare Funds benefits have been used up, for the balance of the maximum of the number of days per contract yearly period available under this Article.

(7)    The provisions of this Article shall apply to employees after they have been employed for twelve months.

(8)    As to employees hired after September 1, 1993, the maximum number of sick days per contract year shall be five (5) days instead of ten (10) days. Such sick days shall be granted on January 1 of each calendar year, provided that the number of sick days shall be prorated for the period from April 1, 1999 through and including December 31, 1999.

ARTICLE XVII

PENSION

This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this Agreement.

(a)    Commencing with the first day of April, 1999, and for the duration of the current collective bargaining Agreement between Local 25 and the Employer, and any renewals or extensions thereof, the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective

bargaining Agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or non-member of the Local Union, from the first hour of employment subject to this collective bargaining Agreement, as follows:

For each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, the Employer shall make a contribution of one dollar and sixty-one cents ($1.61) to the New England Teamsters and Trucking Industry Pension Fund but not more than sixty-four dollars and forty cents ($64.40) per week for any one employee from the first hour of employment in such week.

Commencing April 1, 2000, for each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, the Employer shall make a contribution of one dollar and seventy-one cents ($1.71) to the New England Teamsters and Trucking Industry Pension Fund but not more than sixty-eight dollars and forty cents ($68.40) per week for any one employee from the first hour of employment in such week.

Commencing with the first day of April, 2001, for each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, the Employer shall make a contribution of one dollar and seventy-six cents ($1.76) to the New England Teamsters and Trucking Industry Pension Fund but not more than seventy dollars and forty cents ($70.40) per week for any one employee from the first hour of employment in such week.

Commencing with the first day of April, 2002, for each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, the Employer shall make a contribution of one dollar and ninety-one cents ($1.91) to the New England Teamsters and Trucking Industry Pension Fund but not more than seventy-six dollars and forty cents ($76.40) per week for any one employee from the first hour of employment in such week.

Commencing with the first day of April, 2003, for each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, the Employer shall make a contribution of two dollars and one cent ($2.01) to the New England Teamsters and Trucking Industry Pension Fund but not more than eighty dollars and forty cents ($80.40) per week for any one employee from the first hour of employment in such week.

For purposes of this Article, each hour for which wages are paid or due or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is due or received by the employee, shall be counted as hours for which contributions are payable. In computing the maximum amount due any week, there shall be no daily limit on the number of hours for any one day in such week, whether such hours are performed on straight time or overtime rates, but payments shall be made at the amount set forth above.

If a regular employee (as defined in the collective bargaining Agreement) is absent because of illness or off-the-job injury and notifies the Employer of such absence, the Employer shall continue to make the required contributions for a period

of four (4) weeks, for forty (40) hours per week. If an employee is injured on the job, the Employer shall continue to pay the required contributions at the rate of forty (4) hours for each such week until the employee returns to work; however, such contributions of (40) hours shall not be paid for a period of more than twelve (12) months. The Employer agrees to make contributions up to a maximum of forty (40) hours on behalf of all regular employees who may be on a lay-off status during any payroll period but have completed three (3) days of work in that payroll period.

(b)     The Employer agrees to and has executed a copy of the New England Teamsters and Trucking Industry Pension Fund Agreement and Declaration of Trust, dated April 11, 1958, and accepts such Agreement and Declaration of Trust, as amended, and ratifies the selection of the Employer Trustees now or hereafter serving as such, and all action heretofore or hereafter taken by them within the scope of their authority under such Agreement and Declaration of Trust.

(c)     The parties agree that the Pension Plan adopted by the Trustees of the New England Teamsters and Trucking Industry Pension Fund shall at all times conform to requirements of the Internal Revenue Code so as to enable the Employer at all times to treat its contributions made to the Fund as a deduction for income tax purposes.

(d)     It is also agreed that all contributions shall be made at such time and in such manner as the Trustees shall reasonably require; and the Trustees shall have the authority to have an audit of the payroll and wage records of the Employer for all employees performing work within the scope and/or covered by this collective

bargaining Agreement for the purpose of determining the accuracy of contributions to the Pension Fund and adherence to the requirements of this Article of the collective bargaining Agreement regarding coverage and contributions, such audit may, at the option of the Trustees, be conducted by an independent certified public accountant or a certified public accountant employed by the New England Teamsters and Trucking Industry Pension Fund.

If the Employer shall fail to make contributions to the Pension Fund by the twentieth (20th) day of the month following the month during which the employees performed work or received pay or were due pay within the scope of this collective bargaining Agreement, up to and including the last completed payroll period in the month for which contributions must be paid, or if the Employer, having been notified that its contributions to the Fund have been under reported and/or underpaid, fails within twenty (20) days after such notification to make any required self-audit and/or contributions found to be due, the Local Union shall have the right after an appropriate 72-hour notice to the Employer, to take whatever steps it deems necessary to secure compliance with this Agreement, any provision of this collective bargaining Agreement to the contrary notwithstanding, and the Employer shall be responsible to the employees for losses resulting therefrom.  Also, the Employer shall be liable to the Trustees for all costs of collecting the payments due together with attorneys fees and such interest, liquidated damages or penalties which the Trustees may assess or establish in their discretion.  The Employer's liability for payment

hereunder shall not be subject to the grievance procedure and/or arbitration if such is provided in this Agreement.

It is understood and agreed that once a payment or payments are referred to an attorney for collection by the Trustees of the New England Teamsters and Trucking Industry Pension Fund and/or the Local Union, the Local Union and its business agents or chief executive officer shall have no right to modify, reduce or forgive the Employer with respect to its liability for unpaid contributions, interest, liquidated damages or penalty as may be established or assessed by the Trustees in their discretion against delinquent Employers.

(e)    No oral or written modification of this Article regarding pensions and retirement shall be made by the Local Union or the Employer and, if made, such modification shall not be binding upon the employees performing work within the scope of this collective bargaining Agreement and covered by this Article or upon the Trustees of the New England Teamsters and Trucking Industry Pension Fund.

(f)    All Employers contributing hereunder shall post each month at each terminal or other place of business where employees have easy access thereto an exact copy of the remittance report form of contributions sent to the Fund.

(g)    Whenever an Employer signatory to this Agreement becomes delinquent in contributions owed to the Pension Fund and the Local Union serves a 72-hour notice of delinquency set forth in this Agreement, such Employer after satisfying the delinquency and becoming current, and then during the term of this Agreement becomes delinquent again, shall be required to post a performance bond to satisfy

that second delinquency and/or any further delinquencies during the term of this Agreement.

## ARTICLE XVIII

## MANAGEMENT RIGHTS

The management of the Employer's business and plants and the direction of the working forces are reserved and retained by the Employer, unless and to the extent specifically modified or abridged in this Agreement.

## ARTICLE XIX

## NON-DISCRIMINATION

### Section 1

In accordance with applicable law, the Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin, pregnancy, or age, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, national origin, pregnancy, or age.

### Section 2

The Company and the Union agree that there will be no discrimination by the Company or the Union against any employee because of his or her membership in the Union or because of any employee's lawful activity and/or support of the Union.

### Section 3

The term "he" or "his" as used in this Agreement is not meant to be discriminatory and shall apply equally to male and female employees.

## ARTICLE XX

## NO STRIKE -- NO LOCKOUT

There shall be no strike or stoppage of work, or lockout, during the life of this Agreement.

## ARTICLE XXI

## SEPARABILITY AND SAVINGS PROVISIONS

If any Article or Section of this Agreement or of any Supplements or Riders thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any Supplements or Riders thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

## ARTICLE XXII

## TERMINATION AND RENEWAL

This Agreement shall take effect from the date of execution hereof, except as to effective dates herein otherwise provided, and shall remain in full force and effect through March 31, 2003 at midnight, and shall then and thereafter renew itself from

FOR THE UNION:

TEAMSTERS UNION LOCAL NO. 25
affiliated with
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS

By _____  14/23/99

By _____

LegalA-F/Bellavia_Gerri/Legal/jacobs/105170.111/documents/99cba1.wpf

# Manzi & Associates L.L.C.

Certified Public Accountants

855 Turnpike Street
Suite 140
North Andover, MA 01845

978-975-1099
800-545-1120
Fax: 978-975-0593

July 28, 2004



RECEIVED
JUL 30 2004
TEAMSTERSCARE

Hall & Cole Produce
Attn:  Steve McCluskey
11-13 New England Produce Center
Chelsea, MA 02150

Dear Mr. McCluskey:

The Board of Trustees of Teamsters Union 25 Health Services & Insurance Plan have appointed us as representatives to verify payments to the Plan by Hall & Cole Produce for the period January 1, 2003 through January 2004.  We have scheduled an appointment for August 31, 2004 at 10am.  The following records and information will be necessary for the scheduled appointment. Please have them available for our inspection.

1.    Weekly payroll journals for January 1, 2003 through January 2004.
2.    Individual earnings records (to include time cards) on all employees for January 1, 2003 through January 2004.
3.    All Internal Revenue Service Forms W-2's and W-3 for January 1, 2003 through January 2004.
4.    All federal and state quarterly payroll reporting forms for January 1, 2003 through January 2004.
5.    All Internal Revenue Service Forms 1099's and 1096 for January 1, 2003 through January 2004.

It is the Board of Trustees' responsibility under the Employee Retirement Income Security Act of 1974 (ERISA) to conduct periodic payroll audits of contributing employers in order to execute their fiduciary duties.

If the above appointment is not satisfactory, please contact the undersigned immediately so that a mutually satisfactory date may be set.

Very truly yours,

Debra E. Grott, CPA

Debra E. Grott, CPA
Manzi & Associates L.L.C.

CC:
Mr. Rod Smith
Teamsters Union 25 Health Services & Insurance Plan
16 Sever Street
Charlestown, MA 02129